## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ALISON DOMINGUEZ,

     Plaintiff,

v.                                                          Case No.

AMERICAN AIRLINES, INC.,

     Defendant.

## <u>COMPLAINT</u>

Plaintiff ALISON DOMINGUEZ sues Defendant AMERICAN AIRLINES, INC. and alleges as follows:

### PARTIES

1.     Plaintiff, ALISON DOMINGUEZ, is a citizen and resident of Miami-Dade County, Florida.

2.     Defendant, AMERICAN AIRLINES, INC., is a Delaware corporation with its principal place of business in Fort Worth, Texas.

3.     AMERICAN AIRLINES is a major air carrier providing scheduled air transportation for passengers and cargo through its hubs, including in Miami, Florida.

4.     AMERICAN AIRLINES provides both domestic and international air transportation, including to and from the Bahamas.

### JURISDICTION & VENUE

5.     This Court has personal jurisdiction over AMERICAN AIRLINES pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and Sections 48.193(1)(a)(1) and (2), Florida Statutes, because this cause of action arises from AMERICAN AIRLINES operating, conducting, engaging

in, or carrying on a business or business venture in Florida or having an office or agency in Florida and because Defendant is engaged in substantial and not isolated activity in Florida.

6.      This Court has subject-matter jurisdiction over this action pursuant to Title 28, United States Code, Section 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs and is between citizens of different states.

7.      Venue is proper in this district pursuant to Title 28, United States Code, Section 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district, and AMERICAN AIRLINES conducts substantial business here.

## CONDITIONS PRECEDENT

8.      All conditions precedent have been performed or have occurred.

## GENERAL ALLEGATIONS

### A.  American Airlines Employee-Drug-Smuggling Risk to Passengers

9.      The importation or attempted importation of controlled substances into the United States from any place outside thereof is a felony under Title 21, United States Code, Section 952, and other federal statutes. It is also a common illicit business.

10.      Drug smuggling into the United States from the Caribbean and the Bahamas is a particularly repeat and long-standing problem.[1]

11.      In addition, drug smuggling by airline employees, including in some instances AMERICAN AIRLINES employees is a repeat and long-standing problem, by way of example:

a.      On or around, September 14, 2009, "[e]ight American Airlines employees were among the 23 people arrested in Miami and Puerto Rico as part of Drug Enforcement

---

[1] *See, e.g.*, Department of Justice, NCJRS Virtual Library, "Smugglers Paradise: Cocaine Trafficking through the Bahamas" available at https://www.ojp.gov/ncjrs/virtual-library/abstracts/smugglers-paradise-cocaine-trafficking-through-bahamas; https://www.justice.gov/usao-sdny/pr/us-attorney-announces-cocaine-importation-charges-against-chief-superintendent-royal.

Administration's "Operation Heavy Cargo" that uncovered a drug trafficking organization that used commercial aircraft to import cocaine."[2]

     b.     On or around, October 29, 2009, the head of security for AMERICAN AIRLINES in Haiti was indicted on charges of smuggling millions of dollars of drugs into the United States.[3]

     c.     On October 16, 2012, one former AMERICAN AIRLINES baggage handler was sentenced to life in prison for "his leadership in a drug trafficking organization" involving the smuggling of vast amounts of cocaine hidden in commercial flights into the U.S. and throughout the Caribbean. Six other AMERICAN AIRLINES employees pleaded guilty in the scheme.[4]

     d.     On or around January 31, 2017, 30 pounds of cocaine was found hidden in the nose cone of an AMERICAN AIRLINES Boeing 757 which had flown from Bogota to Miami.[5]

     e.     On or around May 15, 2018, seven employees of Envoy Air, operating as "American Eagle" and owned by AMERICAN AIRLINES, were arrested by the FBI in an alleged drug smuggling ring; at the time, AMERICAN AIRLINES stated: "At American and Envoy Air, we have an unwavering commitment to the safety and security of our customers and team members … We take this matter very seriously and are cooperating with law enforcement during their investigation."[6]

---

[2] https://www.policemag.com/special-units/news/15344088/american-airline-employees-arrested-for-using-commercial-aircraft-to-ship-drugs?utm

[3] https://www.voanews.com/a/a-13-a-2004-10-16-8-american-67482017/281464.html

[4] https://www.ice.gov/news/releases/life-sentence-former-american-airlines-employee-who-led-drug-enterprise

[5] https://www.cntraveler.com/story/30-pounds-of-cocaine-found-stashed-in-american-airlines-planes-nose?utm

[6] https://abcnews.go.com/US/undercover-fbi-operation-busts-10-airline-employees-alleged/story?id=55182504&utm

     f.    On or around May 3, 2023, an AMERICAN AIRLINES mechanic was found guilty of trying to smuggle 25 pounds of cocaine in a compartment beneath a passenger plane traveling from Jamaica to the United States.[7]

12.    AMERICAN AIRLINES flights to the United States from the Lynden Pindling Airport (LPIA) in Nassau, Bahamas have posed a specialized smuggling risk for some time. For instance, in 2013, the U.S. State Department communicated its concern "about the growing trend of cocaine smuggling through Bahamian airports - particularly cases in which LPIA staff are implicated."[8]

13.    AMERICAN AIRLINES flights to the United States from LPIA pose a further specialized smuggling risk because LPIA is a U.S. pre-clearance facility which means that U.S. bound passengers pre-clear U.S. Customs at LPIA and then disembark at standard, domestic gates upon arrival in the U.S. with no further inspection.

14.    This pre-clearance arrangement benefits AMERICAN AIRLINES because it can "access less-expensive U.S. domestic gates and more flexible arrival times at airports in the U.S."[9]

15.    The pre-clearance arrangement also creates a specialized smuggling risk for U.S- (and Miami-) bound passengers.

16.    Because pre-cleared passengers are not required to claim checked luggage and personally walk it through U.S. Customs in the U.S. (and Miami) upon arrival, there is an opportunity for an AMERICAN AIRLINES employees to falsely check baggage (with drugs) in passengers' names and arrange for a third-party to pick up the bags at the publicly accessible, domestic baggage claim upon its arrival in the U.S.

---

[7] https://www.cbsnews.com/news/american-airlines-mechanic-paul-belloisi-convicted-smuggling-25-pounds-cocaine-cockpit/
[8] https://www.bahamaslocal.com/newsitem/67726/US_Fears_In_War_On_Drugs.html?utm
[9] https://www.cbp.gov/travel/preclearance

17.     The scheme works as follows:

a.     First, an AMERICAN AIRLINES employee in the Bahamas falsely checks a bag full of drugs under the name of a passenger travelling to the U.S.

b.     Second, assuming the baggage passes pre-clearance in the Bahamas, it arrives in the U.S, and an accomplice grabs it off the domestic baggage claim.

c.     Third, the passenger is none-the-wiser because they do not miss the baggage they never knew to look for, and the accomplice has no issue picking it up because there is no U.S. Customs to clear upon arrival.

18.     This scheme is not possible without U.S. pre-clearance because, in a standard U.S. Customs scenario, the international arrival baggage claim is not publicly accessible, and the passenger would have no reason to pick up a bag falsely checked in their name and walk it through customs. Also, at LPIA there is apparently no requirement that passengers departing to the U.S. physically walk their baggage through U.S. Customs pre-clearance prior to checking them.

19.     This scheme poses a substantial risk to passengers. If the contraband is discovered in the luggage falsely labeled, the targeted passengers are likely to face investigation, imprisonment, and prosecution in the Bahamas, if not also in the United States, which will cause foreseeable reputational, emotional, and physical harm. With respect to the former, arrest or imprisonment in the Bahamas is widely known to present foreseeable risk of serious physical harm.[10]

---

[10]*See, e.g.*, https://www.wsj.com/livecoverage/sam-bankman-fried-arrested-ftx-congress/card/inside-fox-hill-the-bahamas-only-prison-i3v6E4lIt7LArGHbgyMA; *see also* The Bahamas 2021 Human Rights Report, U.S. Department of State, available at https://www.state.gov/wp-content/uploads/2022/02/313615_BAHAMAS-2021-HUMAN-RIGHTS-REPORT.pdf

20.     Tragically for PLAINTIFF, she endured these very harms as a victim of this scheme and AMERICAN AIRLINES intentional and negligent actions and inactions.

**B. American Airlines Miami Operations & Knowledge of Risk**

21.     AMERICAN AIRLINES centrally controls, manages and supervises its employees and operations from the United States, and, particularly with respect to its operation in the Bahamas and the Caribbean, from Miami, Florida.

22.     AMERICAN AIRLINES is also fully engaged with law enforcement with respect to the risks of drug smuggling and otherwise fully aware of those risks.

23.     AMERICAN AIRLINES has a "Corporate Security Team" which includes the role of "Transitional Threats Manager," operating out of Miami and responsible for narcotic smuggling threats. In fact, below is an AMERICAN AIRLINES job posting for this position from on or around November of 2024:[11]

---

[11] https://www.tealhq.com/job/transnational-threats-manager-corporate-security_2ac82698-6ba6-4327-865e-79f74d87d668?utm_source

## Transnational Threats Manager, Corporate Security

**American Airlines Group**   posted 10 months ago

**Full-time · Senior**    **Miami, FL**    **Air Transportation**

### About the position

The Transnational Threats Manager is a key member of the Corporate Security Team at American Airlines, responsible for conducting and coordinating investigations related to transnational threats, particularly narcotic smuggling. This role involves implementing preventive strategies to protect customers, employees, and corporate assets, while serving as a liaison with law enforcement and regulatory agencies. The position requires strong leadership skills to oversee a team and manage a multi-million-dollar narcotics detection canine service contract, as well as the ability to develop and track performance metrics to measure the success of countermeasures against narcotic smuggling.

### Responsibilities

- Serve as the subject matter expert (SME) on transnational threats and crime for American Airlines (AA).
- Lead a team that deploys and supervises contractors in tactical countermeasures against transnational threats.
- Oversee a multi-state, multi-airport narcotics detection canine service contract program.
- Develop, track, and deliver on goals, objectives, and key performance indicators (KPI) for transnational threat countermeasures.
- Create annual budgets, capital plans, and project plans related to narcotic smuggling prevention.
- Own the corporate anti-narcotic smuggling strategy to prevent the use of team members, contractors, and assets for narcotic smuggling.
- Partner with internal and external business partners to implement anti-narcotics policies and procedures.
- Prepare and deliver briefings and reports on narcotic smuggling trends and investigations to company leaders.
- Build and leverage relationships with U.S. and foreign law enforcement and industry partners.
- Represent AA in meetings with regulators, task forces, and law enforcement agencies.
- Conduct investigations and gather evidence to eliminate insider threats related to drug smuggling.

### Requirements

- Bachelor's degree in a relevant field or equivalent experience.
- 5+ years of supervisory/management experience.
- Strong analytical skills with the ability to research and present findings.
- Knowledge of Microsoft Office.

### Nice-to-haves

- 20 years' experience in law enforcement or military service.
- 10 years' experience in narcotic investigations.
- Experience with U.S. Southern Command (SOUTHCOM) counter-drug operations.
- Bilingual in Spanish preferred.
- Previous anti-narcotics work experience in the Caribbean or South/Central America.

### Benefits

- Health insurance
- Dental insurance
- Flexible spending account
- Employee assistance program
- Vision insurance
- Pet insurance
- Travel perks for employees and their families
- Wellness programs
- 401(k) program with employer contributions after one year
- Discounts on hotels, cars, cruises, and more.

24.     The job posting, among other things, establishes AMERICAN AIRLINES' knowledge and familiarity with the risks of drug smuggling through "transnational," commercial airtravel: "narcotics smuggling," "strategies to protect customer," "liais[ing] with law enforcement," "multi-million-dollar narcotics detections canine service contract," "countermeasures against narcotics smuggling," "KPI"s for the same, "anti-narcotics policies and procedures," "briefings and reports on narcotic smuggling trends," "meetings with regulators, task forces, and law enforcement agencies," "insider threats related to drug smuggling," "U.S. Southern Command (SOUTHCOM) counter-drug experience," and the benefit of "[p]revious work experience in the Caribbean or South/Central America."

25.     AMERICAN AIRLINES passengers would have no reason to know of these insider "threats," their need for protection against them, or the intelligence apparatus within AMERICAN AIRLINES that exists in response to them. AMERICAN AIRLINES does not warn passengers about these risks.

26.     AMERICAN AIRLINES does not warn passengers of any risks associated with the risks of drug smuggling through passengers' baggage, but acknowledges how important security is when it comes to handling and transporting baggage.  For example,  on April 8, 2025, just days before the incident in question, AMERICAN AIRLINES issued a press release titled "American and U.S. Customs and Border Protection pilot innovative baggage screening initiative" that would "provide a more seamless and enhanced customer experience for passengers traveling internationally *while maintaining the highest levels of security*."

### C.  Alison Dominguez's Framing, Defaming & False Imprisonment

27.     At all material times, the AMERICAN AIRLINES was engaged in the business of operating airplanes for fare-paying passengers.

28.     ALISON DOMINGUEZ was the listed passenger on a round-trip ticket purchased for from AMERICAN AIRLINES for a flight operated by AMERICAN AIRLINES from Miami, Florida (MIA) to Nassau, Bahamas (LPIA), departing on April 10, 2025, and returning on April 12, 2025.

29.     On or around April 10, 2025, ALISON DOMINGUEZ departed from MIA and landed at LPIA without incident and thereafter spent two days vacationing in the Bahamas awaiting her return flight.

30.     On or about April 12, 2025, around 12:30 p.m., ALISON DOMINGUEZ checked into her AMERICAN AIRLINES return flight to MIA (AA Flight 3685) online and received a mobile boarding pass.

31.     AA Flight 3685 was scheduled to depart on or about 6:36 p.m. from LPIA to MIA.

32.     ALISON DOMINGUEZ did not arrive at the LPIA until around 4:40 p.m., at which time she proceeded straight to the security clearance area and U.S. Customs pre-clearance using her TSA Precheck and Global Entry clearance.

33.     ALISON DOMINGUEZ did not check any bags for AA Flight 3685.

34.     At or around 5:10 p.m., while waiting in the airport lounge for the departure of AA Flight 3685, ALISON DOMINGUEZ was summoned by an AMERICAN AIRLINES employee to the departure gate where the AMERICAN AIRLINES employee and two U.S. Customs agents were waiting.

35.     After moving to a private area, the two U.S. Customs agents showed ALISON DOMINGUEZ a bag that had been checked by American Airlines under ALISON DOMINGUEZ's name, labeled by AMERICAN AIRLINES with a publicly visible tag containing ALISON DOMINGUEZ's name, and otherwise recorded as belonging to and having been checked

by ALISON DOMINGUEZ in AMERICAN AIRLINES records and electronic systems (the "False Bag").

36.     ALISON DOMINGUEZ had never before seen this False Bag, never possessed or controlled it, did not check it onto AA Flight 3685, and never authorized anyone to do so for her. AMERICAN AIRLINES' statements and records otherwise were false.

37.     The U.S. Customs agents proceeded to inform ALISON DOMINGUEZ that the False Bag contained over one hundred (100) bottles of codeine, a Schedule II controlled substance.

38.     Neither the U.S Customs agents nor local Bahamian law enforcement would believe ALISON DOMINGUEZ's protestations of innocence—at least not initially.

39.     ALISON DOMINGUEZ and the relevant law enforcement agencies would later learn that an AMERICAN AIRLINES employee falsely checked the bag in ALISON DOMINGUEZ's name as part of a drug importation scheme designed to take advantage of the U.S. Customs pre-clearance system, but not before ALISON DOMINGUEZ would spend almost a week imprisoned under horrific conditions as a result.

40.     As a result of the actions and inactions of AMERICAN AIRLINES and its employees and agents, ALISON DOMINGUEZ suffered physical, emotional, and reputational injury.

41.     During her wrongful incarceration, ALISON DOMINGUEZ was forced to sleep on a concrete floor of a cell—soiled with urine and feces—at times without access to bathroom facilities, at another time subject to threatened rape by a male inmate, and yet at another time told by the guards that she was potentially exposed to AIDS. These are but a few examples of what she was foreseeably subjected to by AMERICAN AIRLINES' actions and inactions.

42.     For a time, ALISON DOMINGUEZ, while knowing that she was innocent and victim of a criminal conspiracy, did not know who was conspiring against her, who at AMERICAN AIRLINES was involved or who in law enforcement might also be involved.

43.     During her wrongful incarceration (and after) AMERICAN AIRLINES did nothing to assist ALISON DOMINGUEZ or remedy the situation.

44.     AMERICAN AIRLINES failed to remedy the situation even when it knew or in the exercise of reasonable care should have known that the False Bag did not belong to her.

45.     Only when an AMERICAN AIRLINES employee located at Miami International Airport (MIA) was confronted by a friend attempting to assist ALISON DOMINGUEZ did AMERICAN AIRLINES acknowledge that a bag (the False Bag) had been checked in under her name before ALISON DOMINGUEZ even arrived at LPIA. Had AMERICAN AIRLINES bothered to verify this information before it identified ALISON DOMINGUEZ as a criminal to Bahamian authorities and U.S. Customs, ALISON DOMINGUEZ might have been spared this horrific experience.

46.     It was only with this information that ALISON DOMINGUEZ was able to work to ultimately exonerate herself, albeit too late to avoid her injuries.

47.     On information and belief, AMERICAN AIRLINES received and maintained PLAINTIFF's personally identifiable information on databases hosted on servers located in the United States.

48.     On information and belief, AMERICAN AIRLINES's baggage tagging and identity management systems are hosted on servers located in the United States and are administered by personnel operating within the United States.

49.     On information and belief, key witnesses to the acts and omissions at issue, including AMERICAN AIRLINES's security personnel, IT staff, supervisors, and corporate officers, are located in the United States.

50.     At all material times, illegally transporting drugs or falsely tagging baggage containing drugs with an innocent passenger's name were not legitimate or authorized services of any air carrier, including AMERICAN AIRLINES.

51.     At all material times, no air carrier, including AMERICAN AIRLINES, offered or competed over the services of illegally transporting drugs or falsely tagging baggage containing drugs with an innocent passenger's name.

52.     At all material times, no passengers, including ALISON DOMINGUEZ, expected, contracted, or bargained for the services of the illegal transportation of drugs or the false tagging of baggage containing drugs with the name of passengers.

53.     To be clear, the false tagging of the baggage containing the drugs with ALISON DOMINGUEZ's name was not part of any routine baggage labeling or handling service that AMERICAN AIRLINES provided to passengers and was not the result of any error or mistake in the execution of such a routine baggage labeling or handling service. It was the result, *inter alia*, of an intentional drug smuggling scheme that AMERICAN AIRLINES allowed to occur and to victimize ALISON DOMINGUEZ.

### CLAIMS IN THE ALTERNATIVE

54.     Pursuant to Federal Rule of Civil Procedure 8(d), ALISON DOMINGUEZ brings each of the follow claims under Florida law, and in the alternative as to each, under Texas or Bahamian law.

### COUNT 1
### (Negligence)

55.     PLAINTIFF re-alleges and incorporates paragraphs 1 through 54 as though fully set forth herein.

56.     At all material times, AMERICAN AIRLINES owed PLAINTIFF a duty to exercise the reasonable care demanded under the circumstances. AMERICAN AIRLINES owed this duty to PLAINTIFF for multiple independent reasons.

57.     First, AMERICAN AIRLINES owed the Plaintiff a duty because it acted as a common carrier.

      a.     AMERICAN AIRLINES undertook to transport persons from place to place by way of airplane, offering its services to all who chose to employ it.

      b.     As a common carrier, AMERICAN AIRLINES owed passengers, including PLAINTIFF, a duty to exercise the highest degree of care that is consistent with the practical operation of its airline.

58.     Second, AMERICAN owed the PLAINTIFF a duty because of its special relationship with the PLAINTIFF. This is because, among other things:

      a.     PLAINTIFF was a customer of AMERICAN AIRLINES;

      b.     PLAINTIFF entrusted her personally identifiable information, including her name, address, and date of birth, to AMERICAN AIRLINES with the understanding and belief that AMERICAN AIRLINES would safeguard that information and prevent it from being stolen or misused;

      c.     PLAINTIFF relied on AMERICAN AIRLINES to assist her with safe and orderly international travel; and

d.      on information and belief, unlike PLAINTIFF, AMERICAN AIRLINES was aware of instances of persons smuggling drugs into the United States by falsely tagging baggage containing those drugs with the name of uninvolved passengers, and other similar schemes involving flights to MIA.

59.      Third, AMERICAN AIRLINES owed the PLAINTIFF a duty because its conduct foreseeably created a broader zone of risk that posed a general threat of harm to others.

a.      Specifically, by its very nature, an airline's transportation of people and baggage by airline across state and international lines creates a zone of risk for all people who foreseeably participate in that transportation.

b.      Beyond the risks inherent in the transportation itself, there are the risks involved in handling baggage and transporting that baggage across state and international lines.

c.      At all material times, AMERICAN AIRLINES understood—and should have understood—the extent of risks involved in its business and, particularly, the security risks involved in handling baggage and transporting that baggage across state and international lines.

d.      Indeed, AMERICAN AIRLINES has publicly acknowledged how important security is when it comes to handling and transporting baggage. On April 8, 2025, just days before the incident in question, AMERICAN AIRLINES issued a press release titled "American and U.S. Customs and Border Protection pilot innovative baggage screening initiative" that would "provide a more seamless and enhanced customer experience for passengers traveling internationally ***while maintaining the highest levels of security***."

14

60.     AMERICAN AIRLINES breached its duty to the PLAINTIFF. Among other things:

a.     AMERICAN AIRLINES failed to sufficiently safeguard PLAINTIFF's personally identifiable information, including her name;

b.     AMERICAN AIRLINES failed to sufficiently safeguard its own baggage tagging and identity management systems; and

c.     AMERICAN AIRLINES failed to employ security staff and/or implement measures sufficient to ensure that any false association of a passenger with a bag would be identified, stopped, and/or remedied.

61.     AMERICAN AIRLINES's breach injured the PLAINTIFF in a foreseeable manner, as AMERICAN AIRLINES's employee was able to access her personally identifiable information and use it to falsely tag baggage containing drugs in her name.

62.     As a result of her arrest and ultimate jailing, the Plaintiff suffered physical impacts, including bruising and other physical injuries.

63.     AMERICAN AIRLINES's breach directly and proximately caused PLAINTIFF's damages.

64.     This claim does not relate to any service of an air carrier but, rather, relates to outrageous conduct that went beyond the scope of normal airline operations.

65.     As a result of the above, ALISON DOMINGUEZ sustained bodily injury and resulting pain and suffering, loss of liberty, reputational harm, disability, mental distress and anguish, inconvenience, loss of capacity for the enjoyment of life, , and aggravation of a previously existing condition. The losses and injuries are permanent and continuing and Plaintiff will suffer the losses in the future.

15

WHEREFORE, ALISON DOMINGUEZ requests that the Court enter judgment in her favor and against Defendant AMERICAN AIRLINES, INC. and award all damages and other relief to which she is entitled.

**COUNT 2**
**(Negligent Failure to Warn)**

66.     PLAINTIFF re-alleges and incorporates paragraphs 1 through 54 as though fully set forth herein.

67.     At all material times, AMERICAN AIRLINES owed PLAINTIFF to warn of the foreseeable criminal conduct by its employees (*e.g.*, narcotics smuggling and framing passengers for the same) in light of its superior knowledge regarding the harm.

68.     As evidenced by it actions and representations, AMERICAN AIRLINES undertook a duty to warn riders, such as PLAINTIFF, of the risk of criminal conduct.

69.     AMERICAN AIRLINES additionally owed a duty to warn based upon its substantial control over the PLAINTIFF so as to deprive the PLAINTIFF of her normal opportunities for protection.

70.     AMERICAN AIRLINES breached its duty by failing to adequately warn Plaintiff of the foreseeable criminal conduct.

71.     As a direct and proximate result of the negligent acts described above, Plaintiff suffered, *inter alia*, bodily injury and resulting pain and suffering, loss of liberty, reputational harm, disability, mental distress and anguish, inconvenience, loss of capacity for the enjoyment of life, , and aggravation of a previously existing condition. The losses and injuries are permanent and continuing and Plaintiff will suffer the losses in the future.

72.     AMERICAN AIRLINES's breach injured the PLAINTIFF in a foreseeable manner, as AMERICAN AIRLINES's employee was able to access her personally identifiable information and use it to falsely tag baggage containing drugs in her name.

73.     As a result of her arrest and ultimate jailing, the Plaintiff suffered physical impacts, including bruising and other physical injuries.

74.     AMERICAN AIRLINES's breach directly and proximately caused PLAINTIFF's damages.

75.     This claim does not relate to any reasonable service of an air carrier but, rather, relates to outrageous conduct that went beyond the scope of normal airline operations.

76.     As a result of the above, ALISON DOMINGUEZ sustained bodily injury and resulting pain and suffering, loss of liberty, reputational harm, disability, mental distress and anguish, inconvenience, loss of capacity for the enjoyment of life, , and aggravation of a previously existing condition. The losses and injuries are permanent and continuing and Plaintiff will suffer the losses in the future..

WHEREFORE, ALISON DOMINGUEZ requests that the Court enter judgment in her favor and against Defendant AMERICAN AIRLINES, INC. and award all damages and other relief to which she is entitled.

## COUNT 3
### (Defamation by Implication)

77.     PLAINTIFF re-alleges and incorporates paragraphs 1 through 54 as though fully set forth herein.

78.     AMERICAN AIRLINES maintained and controlled the systems used to tag and associate baggage with specific passengers.

79.    AMERICAN AIRLINES exercised exclusive authority over what bags were tagged under each passenger's name, including during international travel.

80.    AMERICAN AIRLINES designed, implemented, and enforced the protocols for baggage check-in and identification, including employee access controls and baggage tracking procedures.

81.    AMERICAN AIRLINES knew or should have known of the risk that individuals—including its own employees—might abuse access to its baggage systems to falsely associate contraband with innocent passengers.

82.    Despite this knowledge, AMERICAN AIRLINES failed to implement adequate safeguards, monitoring, or audit controls to detect and prevent the false tagging of baggage containing illicit materials with the names of uninvolved passengers.

83.    As a result of AMERICAN AIRLINES's inadequate supervision and security procedures, a bag containing illicit drugs was processed and tagged under PLAINTIFF's name and flight record.

84.    The bag was then introduced into AMERICAN AIRLINES's international baggage handling system under PLAINTIFF's name, and information about the bag's ownership and routing was published to third parties, including airport personnel, customs and border protection personnel, and foreign law enforcement officials.

85.    By placing PLAINTIFF's name and flight record on the bag containing drugs and transmitting that information through its systems to third parties, AMERICAN AIRLINES caused the publication of a false implication: that PLAINTIFF had knowingly possessed and attempted to smuggle illicit drugs.

18

86.     AMERICAN AIRLINES knew or should have known that the baggage containing the illicit drugs did not belong to the PLAINTIFF. In other words, AMERICAN AIRLINES knew or should have known that the implication—that PLAINTIFF had knowingly possessed and attempted to smuggle illicit drugs—was false.

87.     The false implication was communicated to third-parties, including law enforcement, which relied on the information provided by AMERICAN AIRLINES to arrest and detain PLAINTIFF.

88.     The defamatory implication arose not from a truthful act or clerical error, but from AMERICAN AIRLINES's own conduct in operating a system that allowed criminal misuse of passenger identity to go undetected and uncorrected.

89.     AMERICAN AIRLINES acted negligently in operating a baggage and identity management system that foreseeably resulted in false and defamatory communications implicating innocent passengers in criminal conduct.

90.     As a result of AMERICAN AIRLINES 's defamation, PLAINTIFF suffered actual damages, including arrest, detention, loss of liberty, reputational injury, and emotional distress.

91.     This claim does not relate to any service of an air carrier but, rather, relates to outrageous conduct that went beyond the scope of normal airline operations.

92.     As a result of the above, ALISON DOMINGUEZ sustained bodily injury and resulting pain and suffering, loss of liberty, reputational harm, disability, mental distress and anguish, inconvenience, loss of capacity for the enjoyment of life, , and aggravation of a previously existing condition. The losses and injuries are permanent and continuing and Plaintiff will suffer the losses in the future.

WHEREFORE, ALISON DOMINGUEZ requests that the Court enter judgment in her favor and against Defendant AMERICAN AIRLINES, INC. and award all damages and other relief to which she is entitled.

## COUNT 4
### (False Imprisonment)

93.     PLAINTIFF re-alleges and incorporates paragraphs 1 through 54 as though fully set forth herein.

94.     AMERICAN AIRLINES maintained and controlled the systems used to tag and associate baggage with specific passengers.

95.     AMERICAN AIRLINES exercised exclusive authority over which bags were associated with each passenger, including international flights.

96.     AMERICAN AIRLINES implemented and operated procedures for tagging baggage that involved the use of sensitive passenger information, including name, flight record, and other identifying details.

97.     AMERICAN AIRLINES knew that its baggage tagging system could be misused by individuals, including its own employees, to falsely associate a bag with an innocent passenger.

98.     AMERICAN AIRLINES failed to implement safeguards, oversight mechanisms, or real-time alerts that would detect or prevent the false tagging of baggage containing illicit items to uninvolved passengers.

99.     Due to AMERICAN AIRLINES's inadequate system controls, a bag containing illicit drugs was tagged and entered into AMERICAN AIRLINES's baggage handling system under PLAINTIFF's name.

100.    AMERICAN AIRLINES falsely informed airport personnel, customs and border protection personnel, and foreign law enforcement officials that the baggage belonged to the PLAINTIFF.

101.    The information provided by AMERICAN AIRLINES caused airport personnel, customs and border protection personnel, and Bahamian law enforcement to identify PLAINTIFF as the person in possession of the drug-laden bag.

102.    AMERICAN AIRLINES's conduct—namely, falsely associating the bag with PLAINTIFF and communicating that false information to foreign authorities—directly instigated or indirectly procured Plaintiff's arrest.

103.    The PLAINTIFF was arrested without legal authority.

104.    AMERICAN AIRLINES's conduct was a substantial and foreseeable cause of PLAINTIFF's arrest and unlawful detention, the latter of which lasted for multiple days in a foreign jail.

105.    The unlawful detention of the PLAINTIFF was against her will.

106.    The unlawful detention of the PLAINTIFF was unreasonable and unwarranted under the circumstances.

107.    As a result of the false imprisonment, PLAINTIFF suffered actual damages, including arrest, detention, loss of liberty, and emotional distress.

108.    This claim does not relate to any service of an air carrier but, rather, relates to outrageous conduct that went beyond the scope of normal airline operations.

109.    As a result of the above, ALISON DOMINGUEZ sustained bodily injury and resulting pain and suffering, loss of liberty, reputational harm, disability, mental distress and anguish, inconvenience, loss of capacity for the enjoyment of life, , and aggravation of a

previously existing condition. The losses and injuries are permanent and continuing and Plaintiff will suffer the losses in the future.

WHEREFORE, ALISON DOMINGUEZ requests that the Court enter judgment in her favor and against Defendant AMERICAN AIRLINES, INC. and award all damages and other relief to which she is entitled.

### DEMAND FOR JURY TRIAL

ALISON DOMINGUEZ demands a trial by jury.


Dated: September 23, 2025                              Respectfully submitted,

**Maderal Byrne & Furst PLLC**
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, Florida 33134
(305) 520-5690

*/s/ Rachel Wagner Furst*
Fla. Bar. 45155
rachel@maderalbyrne.com

Francisco R. Maderal, Esq
Fla. Bar No. 0041481
frank@maderalbyrne.com

Nicole Estrada, Esq.
Fla. Bar. No. 1017979
nicole@maderalbyrne.com

*Attorneys for Plaintiff*